445 So.2d 1203 (1984)
STATE of Louisiana
v.
Sterling RAULT, Sr.
No. 83-KA-0730.
Supreme Court of Louisiana.
January 16, 1984.
Rehearing Denied February 15, 1984.
*1206 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William Campbell, David Paddision, Christopher Phillipp, Asst. Dist. Attys., for plaintiff-appellee.
Dwight Doskey, New Orleans, for defendant-appellant.
WATSON, Justice.
Defendant, Sterling Rault, Sr., was convicted by a jury of the March 1, 1982, first degree murder of Janie Francioni. LSA-R.S. 14:30. After a sentencing hearing, the jury recommended the death penalty on the basis of three aggravating circumstances: (1) the defendant was engaged in the perpetration or attempted perpetration of aggravated rape or aggravated kidnapping; (2) the offense was committed in an especially heinous, atrocious or cruel manner; and (3) the victim was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant. Rault has appealed, relying on nine assignments of error for reversal of his conviction and sentence.

FACTS
Sterling Rault was the Assistant Comptroller of LUTEX,[1] where Janie Francioni worked as a secretary. On the evening of March 1, 1982, a Monday, fellow employees observed Rault and Francioni leaving work together in her car. Less than an hour later, three U.N.O. students saw the two struggling in the campus parking lot. Francioni screamed at the students, asking them to call the police and make him leave her alone, because he was attempting rape. The student closest to the car observed what appeared to be splashes of blood on her clothing. Rault repeatedly said he had to get her to the hospital, before throwing "her into the car from the driver's side all the way to the passenger's side" (Tr. 50) and driving away.
Approximately 9:20 P.M. that evening, a state trooper driving north on Paris Road in an isolated area of New Orleans East stopped to investigate what appeared to be a brush fire and discovered a burning female body. Close by were a partially full five gallon gasoline can and Francioni's blood stained car, which smelled strongly of gasoline. A spent bullet was on the floor of the car.
The victim had a man's belt wrapped around her neck and a jagged wound on the right side of her neck. She had been shot twice. One bullet had struck her in the thigh, traveling into the abdomen, through the small intestines, stomach and liver before exiting the left side of her chest. The pathologist testified that this would have caused extensive slow bleeding. The wound would have been very painful and would have resulted in death in "less than a matter of hours." (Tr. 21) The second bullet entered directly into the abdomen, damaging blood vessels in the right kidney and the large blood vessel known as the interior vena cava, before lodging in the spine. This second bullet would have caused extensive, fairly rapid bleeding, and would have been fatal within five to ten minutes.
The victim was dead when the neck wound was inflicted and she was set on fire. Her fingernail scrapings had human blood on them.
Janie Francioni had been with her mother and a friend during the preceding weekend and had had no sexual encounters. Her mother took her to work that Monday morning. However, she had engaged in *1207 sexual activity twelve to twenty-four hours prior to her death. Vaginal swabs showed seminal fluid but no sperm. Sterling Rault had a vascectomy in 1979.
When police searched the area, they detected movement under a nearby bridge. As they approached, a man broke and ran. After a brief chase, he turned around, threw up his hands, and hollered, "I'm Sterling Rault". (Tr. 87)
Rault appeared quiet, calm and relaxed. Dressed in casual clothing, he was lacking a belt and had a strong aroma of gasoline. There were several fresh, red scratch marks across his chest and his right hand was very swollen. After being advised of his rights, Rault claimed two men in ski masks had kidnapped him and Janie Francioni and raped her.
Testimony at trial revealed that Rault had been embezzling funds from LUTEX. Two checks, totaling over $84,000, payable to Jerry Jones, did not have Jones' endorsement but had cleared the company account. Rault had opened a B.N.O. checking account in February, 1982, under the name of Jerry Jones and deposited the two Jones checks into this account. Three checks were written on the account, two of them payable to Janie Francioni. Rault was with her when she cashed the first check. A handwriting expert established that Rault had signed the name of Jerry Jones on the checks. Rault had also used the name to order $62,000 worth of gold coins from a local dealer.
In December, 1981, a .25 caliber Guardian semi-automatic pistol had been sold to a buyer with a driver's license in the name of Jerry Jones. In executing a search of Rault's residence, police recovered a gun box for a Guardian .25 caliber pistol, a box of .25 caliber cartridges and a Mississippi driver's license in the name of Jerry Jones.
The bullets recovered from the victim's body and car were similar to the ammunition in Rault's residence. The two bullets found had been fired from the same gun and their markings were consistent with being fired from a Guardian gun.
Jerry Jones testified that he had known the defendant for eight or nine years when both of them lived in Laurel, Mississippi, but he did not purchase a gun in 1981 and did not open a checking account at the Bank of New Orleans.
Rault pled not guilty and not guilty by reason of insanity. In support of his insanity defense he offered testimony by a private investigator, who was also a certified hypnotist, and by a psychiatrist, Dr. Charles Steck. Both experts hypnotised him. While in a hypnotic trance, Rault claimed that three deceased persons orchestrated the day of the murder through post-mortem appearances. Elroy Coffey, Rault's first cousin who committed suicide in 1975, allegedly encouraged Rault to have sex with Janie Francioni.
Under hypnosis, Rault also admitted he had scuffled with the victim at the U.N.O. parking lot, a gun had gone off injuring her, and he had taken her to New Orleans East. However, he claimed he tried to protect her from Elroy and another deceased cousin, Darryl, who maimed and beat her, drug her around with the belt and then set her on fire.
It was the defense psychiatrist's expert opinion that Rault was "in the process of becoming insane" (Tr. 323). When Rault is in a self-induced hypnotic trance, as on the night of the crime, he does not know the difference between right and wrong because "he's in another world". (Tr. 327) Although Rault is capable of inducing such trances during stressful situations, he otherwise exhibits no signs of mental illness. This psychiatrist admitted that generally a person under hypnosis will not do something against his moral code and knows the difference between right and wrong.
Dr. Kenneth Ritter, an expert in forensic psychiatry, who was a member of the sanity commission, stated that, in his opinion, Rault knew the difference between right and wrong at the time of the crime. Rault had had no prior treatment for mental disorder. According to Dr. Ritter, a person under hypnosis will not do something he is not predisposed to do. (Tr. 248) In the opinion of Dr. Dabney Ewin, an expert in hypnosis, it is not possible to self-hypnotize *1208 yourself, assume the personality of a dead person and murder or rape someone "if it's against your moral code." (Tr. 400-401)

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends the trial court erred in refusing to allow a demonstration of hypnotic technique.
Defendant filed a pretrial motion to allow demonstrative evidence, consisting of his hypnosis by Dr. Steck on the witness stand. Rault argues that the demonstration would have permitted the jury to evaluate the underlying rationale of Dr. Steck's expert testimony on the issue of his sanity and enable the jury to measure the veracity of his hypnotic experience.
Absent a clear abuse of discretion, a trial judge's ruling as to the relevancy of evidence should not be disturbed. State v. Thibodeaux, 412 So.2d 591 (La., 1982). Counsel apparently intended to call defendant to the stand solely for the demonstration of his "hypnotic condition". Defendant did not take the stand otherwise in his own defense. A trial court has great discretion in permitting or refusing in-court experiments and demonstrations. Criteria for withholding permission include "considerations arising from the possible disruption of orderly and expeditious proceedings or from the lack of similarity between courtroom conditions and the actual conditions sought to be re-tested." State v. Mays, 315 So.2d 766, 768 (La., 1975). See also State v. Hampton, 326 So.2d 364 (La., 1976). What defendant proposed was not a simple demonstration of physical characteristics as was permitted in State v. Square, 433 So.2d 104 (La., 1983) [display of teeth], and State v. Crochet, 354 So.2d 1288 (La., 1977) [display of tatoo]. It is not clear that the hypnotist could have recreated the same trance state that Rault had previously obtained.
At trial, defense counsel moved to introduce into evidence a four hour tape recording of a hypnotic session by the defendant and a hypnotist. During argument on the introduction of the tape, defense counsel stated that the tape was not offered to establish the truth of the contents but to illustrate to the jury the hypnotic technique, the fact that Rault had been in a hypnotic trance and to negate suggestability in the conduct of the session. The trial court ruled that the tape was inadmissible.
The hypnotist had previously described in great detail the technique he used to place defendant under hypnosis. He detailed defendant's physical manifestations which were indicative of a very deep trance stage. Further, he testified as to the kinds of questions he asked defendant and stated he in no way led the defendant or suggested answers to him. In weighing the relative probative value of proffered evidence against its possible prejudicial effect, whether the evidence is merely cumulative is a factor to be considered. State v. Hawthorne, 345 So.2d 1170 (La., 1977).
The trial court did not abuse its discretion in disallowing the tape recording and hypnosis demonstration, which were both cumulative and of questionable validity.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant argues it was error to permit the state to question a defense character witness regarding defendant's embezzlement of $180,000 from his former employer.
Defense counsel asked the witness, a twenty year friend and former classmate of defendant, whether he knew people who had an opinion of Sterling Rault. He replied that he did. When asked what that opinion was, he responded, "Most of them felt he was a good honest person." (Tr. 350) On cross-examination, the prosecutor asked the witness if he knew why Rault had left his former Mississippi employer, the Masonite Corporation. The witness replied that Rault had told him he had left for a better job. The prosecutor then asked, "He got a better job. You didn't know that he had stolen $180,000 from that *1209 company by an embezzlement scheme, did you?" (Tr. 352)
Before the witness answered, defense counsel objected and moved for a mistrial arguing that the question introduced inadmissible other crimes' evidence. The prosecutor made no further reference to embezzlement.
The preceding defense witness was Dr. Steck, who had testified regarding admissions defendant made to him concerning his involvement in the Mississippi embezzlement.
LSA-C.Cr.P. art. 770(2) mandates a mistrial when the prosecutor refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. The accused may introduce evidence of his character to show he is not the type of person who would commit the particular crime charged. Until he does so, his character is not at issue. State v. Frentz, 354 So.2d 1007 (La., 1978). If the accused does place his character at issue, the state is permitted to "introduce testimony of the bad character of the accused only in rebuttal of the evidence introduced by him to show good character." LSA-R.S. 15:481.
Cross-examination of a character witness may extend to his knowledge of particular misconduct, prior arrests, or other acts relevant to the moral qualities pertinent to defendant's crime. State v. Bagley, 378 So.2d 1356 (La., 1979). Such inquiries expose the witnesses' possible lack of knowledge of defendant's character, and his standard of evaluation.
Rault called the witness to show that the crime charged was inconsistent with his character, thus putting his character at issue. Since Rault opened the door in this manner, the state could question the witness about his knowledge of defendant's acts. The question about the embezzlement focused directly upon the character trait the witness ascribed to defendant: that he was a good honest man.
State v. Johnson, 389 So.2d 372 (La., 1980) delineated certain safeguards regulating prosecutor character witness examination. Johnson requires that a trial judge ascertain, out of the presence of the jury, whether the prosecutor has reasonable grounds for cross-examining the character witness about convictions, arrests, or other misconduct of the accused. Johnson further requires that "the witness should not be asked `if he knows' that the accused has committed such other crimes, but only whether he `has heard' that defendant has committed particular acts inconsistent with the reputation vouched for on direct." 389 So.2d at 376.
The Johnson standards were adopted to eliminate undue jury prejudice from improper cross-examination of character witnesses. Here, the prosecution question was phrased in the "if you know," not "have you heard" form. Also, the state failed to lay the proper predicate outside of the jury's presence. Despite this, it does not appear that there was undue prejudice. The jury had just heard another defense witness testify about the same conduct.
In State v. Yates, 350 So.2d 1169 (La., 1977) the state offered in evidence defendant's statement referring to his own "bad record". During voir dire, the defense counsel had made repeated references to defendant's prior convictions. Yates stated that "[t]o introduce defendant's own statement to the same effect neither offends the law nor adds to the prejudice already established by the jury's knowledge of defendant's previous conviction." 350 So.2d at 1173.
Regardless, the witness did not answer the question and the trial court did not abuse its discretion in denying the motion for mistrial. State v. Parker, 416 So.2d 545 (La., 1982).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant argues that the trial court erred in allowing a state witness to testify as an expert that defendant was the type of person who "achieves goals through legal and illegal means."
*1210 On rebuttal, the state called Ms. Nancy Rumage, an expert in the field of psychology, who was questioned regarding a battery of tests she administered to Rault. She testified that he had an "oppositional and negative type personality," that he was "lacking in affect" and related only superficially to people in order to manipulate them. (Tr. 377) She further testified that "his personality structure indicates that he would know the difference between right from wrong." (Tr. 381)
During cross-examination by defense counsel, the witness stated that the defendant's lack of affect "fell into the pattern that he gave as an asocial personality." (Tr. 382) On redirect, in defining an asocial personality, Ms. Rummage gave testimony to which defendant objects.[2] Defendant contends that Ms. Rumage commented on defendant's abilities at deception and thereby invaded the jury's province of judging credibility.
A witness can testify "only as to facts within his knowledge, and neither as to any recital of facts heard by him, nor as to any impression or opinion that he may have." LSA-R.S. 15:463. An exception to this rule is provided for expert witness testimony. "On questions involving a knowledge obtained only by means of a special training or experience the opinions of persons having such special knowledge are admissible as expert testimony." LSA-R.S. 15:464.
Ms. Rumage was recognized as an expert witness and, as such, could express her opinion while testifying. She did not say that defendant was a person who achieves goals through illegal means, but characterized him as having an asocial personality and defined that term for the jury on the basis of her special training and experience.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Defendant argues the trial court erred in allowing one psychiatrist to claim that he had spoken with another, who concurred in his opinion.
On redirect examination, the prosecutor questioned his expert witness as to whether a person would commit a crime while hypnotized. The witness responded that a person would not do so if the act were against his moral code. The prosecutor then asked the witness if he knew Dr. Spiegel[3] and had recently spoken with him. The witness replied that he had and recounted the substance of that conversation.[4] A defense objection was sustained and the jury was instructed to disregard the reply. The prosecutor was then permitted, over a defense hearsay objection, to elicit from the witness the fact that Dr. Spiegel's opinion did not differ from his own.
*1211 Hearsay is testimony in court, or written evidence, of an out-of-court statement offered to show the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court asserter. State v. Hayes, 414 So.2d 717 (La., 1982). In Louisiana criminal trials, hearsay evidence is inadmissible except under certain recognized exceptions. LSA-R.S. 15:434.
Clearly, the witnesses' first answer in which he repeated what Dr. Spiegel had told him was hearsay. The answer to the second question was also arguably hearsay although the witness stated his own conclusion rather than restated what Dr. Spiegel had told him. However, any error in admitting the hearsay testimony did not affect substantial rights of the accused. LSA-C.Cr.P. art. 921. State v. Singleton, 321 So.2d 509 (La., 1975), State v. Andrews, 369 So.2d 1049 (La., 1979), State v. Hayes, supra. Compare State v. Broussard, 391 So.2d 1167 (La., 1980).
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER FIVE
Defendant argues the trial court erred in failing to tell the jury that a reasonable doubt could arise both from the evidence and the lack of evidence.
At the conclusion of the evidence, prior to closing arguments, the trial court placed into the record an in camera conference concerning proposed jury charges. Each attorney was provided the proposed charges and given the opportunity to object and/or request additional instructions. A defense objection to one sentence relating to the prosecution's burden of proof was sustained, and that portion of the charge was deleted. The court added an additional sentence requested by defense counsel, as follows: "The burden is on the State to establish the guilt of the accused to your satisfaction by legal and competent evidence and beyond a reasonable doubt." (Tr. 406) Neither side offered additional corrections or instructions.
Defendant maintains that the judge did not comply with LSA-C.Cr.P. art. 804 which provides in pertinent part:
"A. In all cases the court shall charge the jury that:
* * * * * *
"(2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case ..."
Here, the jury was instructed:
"Ladies and gentlemen, the defendant is presumed to be innocent until he is proven guilty beyond a reasonable doubt.
"The consequence of this rule of law is that the defendant is not required to prove his innocence, but may rest upon the presumption in his favor until it is overcome by affirmative proof. The burden, therefore, is on the State to establish the guilt of the accused to your satisfaction and by legal and competent evidence beyond a reasonable doubt. It is your duty as jurors to consider all the evidence and then apply the law as given by the Court.
"If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt it is your sworn duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, yet if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. However, this doubt must be a reasonable one; that is, one that is founded upon a real, tangible, substantial basis, and not upon mere caprice, fancy or conjecture. It must be such a doubt as would give rise to a grave uncertainty, raised in your minds by reason of the unsatisfactory character of the evidence. A reasonable doubt is not a mere possible doubt. It is an actual or substantial doubt. It is a doubt that a reasonable man would seriously entertain. It is a serious doubt, for which you *1212 could give good reason. What is required is not an absolute or mathematical certainty, but a moral certainty. If, after giving fair and impartial consideration to all the facts in the case, you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty....
"You are the exclusive judges of the facts. You alone shall determine the weight and credibility of the evidence. You are to find from the evidence which facts have been proved and which facts have not been proved...."[5] (Tr. Jury Instructions, pp. 1-2)
State v. Mack, 403 So.2d 8 (La., 1981) stated that Article 804 must be read to the jury. Mack's directive must be modified to approve either a reading of Article 804 or the giving of instructions substantially equivalent to the statute.
In Mack, the charge not only failed to state that reasonable doubt could arise from lack of evidence, but also specifically limited the jurors to the evidence before them to support a reasonable doubt and prohibited them from going outside the trial evidence to find a reasonable doubt. This charge does not have the Mack defect. While not using the exact wording of the statute, this charge requires the jury to determine which facts have been proved and which facts have not been proved. Again, at another point in the charge, the jury was told to consider all the facts of the case and if they found "the evidence unsatisfactory upon any single point ... this would give rise to such a reasonable doubt" as to require a not guilty verdict. The jury was instructed to consider lack of evidence in language substantially equivalent to the statutory wording.
While the exact language of LSA-C.Cr.P. art. 804 was not employed, the jury charge given did not misstate the law. Moreover, the jury was told that unsatisfactory evidence could produce reasonable doubt. Under these circumstances, the trial court's failure to employ the exact language of Article 804 does not require reversal of this conviction.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX
By this assignment of error, defendant challenges the adequacy of evidence of either aggravated rape or aggravated kidnapping, arguing that the state's failure to prove that the murder occurred during the commission of either of these crimes precludes a valid verdict of first degree murder.[6]
The proper standard of appellate review for a sufficiency claim is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Graham, 422 So.2d 123 (La., 1982); State v. Moore, 432 So.2d 209 (La., 1983). Where the evidence against the accused is circumstantial, the proper measure is whether taking as proved all facts which the evidence tends to prove, every reasonable hypothesis of innocence has been excluded. LSA-R.S. 15:438; State v. Graham, supra; State v. Moore, supra; State v. Austin, 399 So.2d 158 (La., 1981).
Aggravated rape is committed where there is intercourse without the lawful consent of the victim under one or more of the following conditions: (1) the victim resists the act to the utmost, but the resistance is overcome by force; (2) the victim is prevented from resisting by threats of *1213 great and immediate bodily harm, accompanied by apparent power of execution; (3) the victim is prevented from resisting because the offender is armed with a dangerous weapon; or (4) the victim is under the age of twelve. LSA-R.S. 14:42. Aggravated kidnapping is the forcible seizing and carrying of any person from one place to another with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value in order to secure release of that person. LSA-R.S. 14:44. Seizure of a person with intent to commit a rape satisfies the requirement that the perpetrator has the intent to force the victim to give up anything of apparent present value. State v. Sonnier, 402 So.2d 650 (La., 1981); State v. Winn, 412 So.2d 1337 (La., 1982).
Defendant's argument is that there is not enough evidence that he committed either crime in connection with Ms. Francioni's murder. A careful review of the record indicates a substantial number of facts tending to prove both crimes. The evidence which points to Rault's guilt can be summarized as follows:
(1) Three witnesses testified that they saw Rault force the victim who had already been shot into a car on the U.N.O. campus and drive away;
(2) One of these three witnesses stated that the victim screamed twice that defendant was going to rape her;
(3) Scientific tests established that the victim had sexual intercourse within twelve to twenty-four hours of her death;
(4) There was no sperm in the seminal fluid on the vaginal swab taken from the victim's body which is consistent with Sterling Rault's vasectomy;
(5) Testimony by the victim's mother and girlfriend established that the victim had not had sexual intercourse the entire weekend and the early morning prior to her murder;
(6) Two bullets were removed from the victim's body indicating that her assailant was armed with a gun;
(7) A LUTEX employee testified that Rault and the victim had only a co-worker relationship;
(8) Defendant was found near the victim's body with fresh scratch marks on his chest;
(9) Scrapings taken from the victim's fingernails indicated the presence of human blood;
(10) Rault gave a statement at the crime scene that he and the victim had been kidnapped by two masked men who had raped the victim but then abandoned this story in favor of a plea of insanity.
These facts, considered in a light most favorable to the prosecution, are sufficient to justify a rational trier of fact in concluding that Rault's guilt was proved beyond a reasonable doubt, meeting the Jackson v. Virginia test.
Since the evidence against Rault is circumstantial, it is also necessary that the evidence exclude every reasonable hypothesis of innocence. As to the aggravated rape, there are only two reasonable hypotheses. Either Rault forcibly abducted the victim from the parking lot, raped and then killed her, or the deceased had voluntary sexual intercourse with the defendant or some other person prior to her demise.
The second hypothesis of innocence is negated by Rault's own statement at the crime scene. He spoke of the victim being raped, not by him, but by two masked kidnappers. The jury could have reasonably concluded that Rault concocted this version of the crime to hide his own guilt.
In regard to aggravated kidnapping, the only possible hypothesis of innocence, given the clear proof of forcible abduction, is that defendant had no intent to force the victim to cede some property, i.e., sexual intercourse, to secure her release. In other words, when Rault abducted the victim from the parking lot, he had no intent to rape her, only to kill her. This hypothesis is negated by the victim's words as she was being forced into the car.
"In comparison with the prosecution's hypothesis of defendant's guilt, which is consistent overall with the evidence, the defendant's circumstantial theory of innocence is remote." State v. Graham, supra, 422 So.2d at 130.
*1214 The jury correctly found that the evidence excludes every reasonable hypothesis of innocence.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
Defendant argues that the trial court erred at the sentencing phase in allowing the state to introduce evidence of uncharged and unproven crimes.
The state, during the sentencing phase, offered testimony linking Rault with embezzlement of the Masonite Corporation, his former Mississippi employer and with a possible attempted murder of a fellow Masonite employee, Ted Boleware. Two witnesses testified that Rault admitted embezzling the money. The Masonite attorney said that Rault executed a $118,846.97 promissory note in favor of the company in restitution. In return, Masonite agreed to forgo criminal prosecution provided Rault left the company. Documentary evidence substantiated the testimony.
Ted Boleware testified that Rault came to him after his dismissal and admitted he had taken more money than had been discovered. Rault gave Boleware a $47,000 check drawn on Masonite and asked him to void it and to keep silent about its existence. Several months later, Rault began telephoning Boleware and succeeded in getting Boleware to come to his home. Rault invited the Boleware family to return to his home for dinner, but Boleware declined because they were attending church that evening. Rault asked several questions concerning the church's location and service times. When the Boleware family left church that evening, their car malfunctioned. The brakelines had been cut. A crime against property report was filed concerning the incident but no arrests were made. Detective Bush testified that the brakelines had been deliberately sawed in half.
Defendant objects to this evidence because: (1) he received no pretrial notice of the state's intent to use this alleged criminal activity as an aggravating circumstance at the penalty phase; (2) the rules of evidence prohibit any state use of "other crimes evidence" unless the defendant first places his character at issue; and (3) the evidence was "rumor and innuendo" and its introduction interjected an arbitrary factor in the sentencing process so prejudicial as to justify the reversal of the sentence.
The state justifies use of the evidence on the ground that the defense first introduced evidence of the events surrounding the Masonite embezzlement in direct examination of its own witness.[7] The state also argues that defendant was not prejudiced because the jury based its recommendation of capital punishment on only three aggravating circumstances, none based on the sentencing phase testimony about a prior history of criminal activity.
Defendant's failure to notice argument is without merit. Arguably under LSA-C.Cr.P. art. 720 the state should have informed the defendant of its intent to offer other crimes evidence. However, failure to comply with discovery procedures does not automatically require reversal. *1215 State v. Knighton, 436 So.2d 1141 (La., 1983). The circumstances must be examined to determine whether defendant was prejudiced and whether the trial court abused its discretion. The testimony of defendant's own witness during the guilt phase of trial made it clear that defense counsel was aware of the Mississippi transactions. Defendant does not contend his strategy would have been different had he been aware of the allegedly nondisclosed evidence. Under these circumstances, the trial court did not abuse its discretion in permitting the evidence to be introduced over a failure of notice objection.
Defendant's second contention, that he must place his character at issue prior to the state use of other crimes evidence, is also without merit. In State v. Jordan, 440 So.2d 716 (La., 1983) this argument was expressly rejected. "It is axiomatic that the conviction per se puts the convicted offender's character at issue. Article 905.2 underpins that precept. To say that in such hearing the character of the defendant cannot be further developed unless he, the offender, first puts it at issue is to read out of the statute its plain unambiguous language and to ignore the basic purpose of the sentencing hearing, i.e., a sentence tailored to the offense committed and in keeping with the verdict, the character and the propensities of the offender." Jordan, supra, at p. 720. See State v. Sawyer, 422 So.2d 95 (La., 1982). Jordan went on to hold that the state may introduce prior conviction evidence in its case-in-chief in the penalty phase of the case.[8]
The Louisiana capital sentencing scheme, LSA-C.Cr.P. art. 905 et seq., provides for a bifurcated trial system in all capital cases. A sentence of death can only be imposed after a sentencing hearing. The jury must first find the existence of at least one statutory aggravating circumstance as a threshold requirement. If such an aggravating circumstance is found, then the jury must take into account any mitigating circumstances and must make a separate finding as to whether the death penalty should be imposed. The jury must consider both the particular crime and the particular offender. As part of the review process, it must be determined whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors.
LSA-C.Cr.P. art. 905.2 sets out the procedural rules for the conduct of sentencing hearings. The article requires that the hearing focus on the circumstances of the offense and the character and propensities of the offender. The jury is permitted to consider any evidence offered at the trial on the issue of guilt. Additionally, the hearing shall be conducted according to the rules of evidence. Recent decisions have explored the parameters of these procedural rules in response to defense arguments of prejudicial conduct.
In State v. English, 367 So.2d 815 (La., 1979) defendant's capital punishment sentence was set aside because one of the aggravating circumstances successfully relied on by the state, that the defendant had been previously convicted of an unrelated murder, was established by hearsay evidence. The court found that hearsay evidence of the prior conviction was prejudicial to the defendant. Such prejudice was exacerbated by the court's finding that it was "unlikely or at least arguable that we would have found that any other aggravating circumstance was proved." English, supra, 367 So.2d at 818.
State v. Monroe, 397 So.2d 1258 (La., 1981) rejected a defense argument that it was reversible error to permit the state to offer at the sentencing hearing the same evidence introduced during the guilt phase of trial. Monroe noted that Art. 905.2 specifically authorizes the jury to consider any evidence offered at the trial on the issue of guilt.
*1216 State v. Mattheson, 407 So.2d 1150 (La., 1981) held it was not error for the state to introduce evidence of defendant's prior convictions at the sentencing hearing without proof by the state that the defendant had been represented by counsel or had waived his right to such representation. The Mattheson crime was committed prior to the amendment to Art. 905.4(c). The court noted that the convictions were not being used to enhance punishment. "[R]ather, defendant's past criminal history was merely a part of the total picture of his `character and propensities'." Mattheson, 407 So.2d at 1164. Defendant was not prejudiced in the eyes of the jury by the prior conviction information, because "[T]he jury was fully apprised that defendant was a law violator through his own testimony." Mattheson, 407 So.2d at 1164.
In State v. Sawyer, 422 So.2d 95 (La., 1982) the state, over defense objection, called a deputy prosecutor from Arkansas to present documentary evidence establishing the circumstances of defendant's prior indictment for second degree murder and his eventual plea to involuntary manslaughter. In recommending the death penalty, the Sawyer jury relied on three aggravating circumstances, one being that defendant had previously been convicted of an unrelated murder. This aggravating circumstance was unfounded. However, defendant's argument that the evidence offered in support of the unproven circumstance introduced an arbitrary factor into the penalty phase was rejected. Defendant specifically argued that evidence of the indictment was inadmissible because only conviction evidence is allowed. Sawyer stated, "Even if the fact of an indictment for a greater offense ... should have been excluded, the gravamen of the evidence was a presentation of the facts of the occurrence, and admission of the indictment was certainly not reversible error." 422 So.2d at 104.
In State v. James, 431 So.2d 399 (La., 1983) the jury returned a death penalty verdict finding two aggravating circumstances had been established, one of which was that defendant had a significant prior history of criminal activity. Defendant argued that the jury's finding of this circumstance was tainted because the trial court erred in allowing the prosecution to base this aggravating circumstance on an armed robbery and murder which occurred subsequent to the crime for which the defendant was standing trial. The court found that the evidence fully supported that the homicide occurred during an armed robbery. "Consequently, under our previous decisions, it is not necessary that we consider the merit of defendant's argument on the assignments of error relative to the jury's findings of other aggravating circumstances." James, supra, 431 So.2d at 405-406.
The objectionable state evidence under scrutiny here does not suffer the infirmity of being hearsay in nature. Direct evidence linked Rault to the Masonite embezzlement and police reports established that criminal conduct played a part in the malfunctioning of Boleware's brakes. Critically important is the fact that the jury was already aware of the alleged criminal activity. As the Monroe court stated, Article 905.2 authorizes the jury to consider any evidence offered at the trial on the issue of guilt. Dr. Steck, defendant's own expert witness, testified he thought Rault cut the brakelines. It is certainly improbable that jury prejudice could be enhanced by the state's evidence establishing that the brakelines had indeed been cut given the damning expert opinion that Rault was guilty of the act. Additionally important is the jury's failure to base its death recommendation on any finding of significant prior history of criminal activity. Finally, as discussed below, the jury recommendation was supported by a finding of at least two valid aggravating circumstances.
Under the circumstances of this case, the evidence was properly admitted.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
Defendant assigns as error the trial court's denial of his requested jury charge[9] relative to LSA-C.Cr.P. art. 905.4(h).[10] *1217 The jury was charged that it could consider as an aggravating circumstance that "the victim was an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant". (Tr., Supplement II, p. 14)
LSA-C.Cr.P. art. 807 provides in pertinent part that "A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent." The requested special charge was properly excluded.
First, it does not appear that the charge could have been given without explanation. The proposed charge requires the jury to "consider the motive for any homicide" necessitating judicial explanation that motive, like intent, can be inferred from the circumstances of the offense.
Second, the requested charge is not a correct statement of the law. The proposed charge requires the jury to find that the homicide was committed to prevent evidence from coming to the attention of police. The statute is not drafted so narrowly. Statutory language would cover the murder of an accomplice thus enabling a surviving offender to escape apprehension or retain the entirety of the spoils of the crime. See State v. Lovett, 359 So.2d 163 (La., 1978); State v. Sonnier, 402 So.2d 650 (La., 1981) cert. denied ___ U.S. ___, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); and State v. Arnaud, 412 So.2d 1013 (La., 1982).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER NINE
Defendant argues the trial judge erred in refusing to grant a new trial.
Prior to imposition of the death sentence, the trial court conducted a hearing on defendant's motion for a new sentencing hearing. At this hearing, defense counsel orally amended his motion[11] to include a motion for a new trial based on the assertion that the state failed to prove first degree murder. The amendment was permitted.
Defendant sought to introduce results of a psychological stress test. The court ruled the evidence inadmissible and defendant was permitted to proffer the excluded test results.[12]
*1218 State v. Catanese, 368 So.2d 975 (La., 1979) held that polygraph evidence may be admitted in post conviction proceedings within the discretion of the trial judge and subject to certain guidelines, whenever the evidence is reliable and will aid in the decision. Catanese is authority for the admissibility of P.S.E. test results. State v. Thompson, 381 So.2d 823 (La., 1980).
LSA-C.Cr.P. art. 851 provides that a new trial shall be granted when new and material evidence that, not withstanding the exercise of reasonable diligence by defendant, was not discovered before or during trial, is available, and if the evidence had been introduced at trial it probably would have changed the guilty verdict. Defendant's P.S.E. test results fail to meet this standard. When the proffered results are compared with the trial testimony of defendant's expert witnesses, it is apparent that it offers nothing new in the way of evidence not otherwise available to the jury. The failure to admit the P.S.E. results was not an abuse of judicial discretion.
This assignment lacks merit.

CAPITAL SENTENCE REVIEW
LSA-C.Cr.P. art. 905.9.1 (Louisiana Supreme Court Rule 28) mandates that this court review every death sentence to determine if it is constitutionally excessive. This court is required to consider the following three factors:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
In compliance with Supreme Court Rule 28, § 3, the trial judge submitted a Uniform Capital Sentence Report. The report indicates that defendant is a thirty-three year old white male, married and the father of two young children whom he lived with and supported. Defendant has a college degree and has been employed in the field of accounting at an annual salary in excess of $25,000 for several years. Rault has no record of prior convictions. However, he was involved in an embezzlement scheme at his previous place of employment about a year prior to this crime. Defendant promised to make restitution and his employer agreed to forgo criminal prosecution. Defendant has no history of alcohol or drug abuse and appears in good health except for a chronic sinus condition.
Psychological testing revealed that defendant has an I.Q. of 102. Results of the personality test reveal that defendant is capable of expressing repressed anger in an explosive manner under stress. He is defensive, angry, non-trusting and manipulative and can be described as a paranoid and anti-social personality.
Defendant offered an insanity defense which was rejected by the jury. Defense witnesses on this issue testified that Rault is highly susceptible to hypnosis and is capable of self-induced hypnotic trances. While in a hypnotic trance, he hallucinates figures of long dead relatives and ascribes many of his own actions to these relatives. The state offered expert witness testimony that defendant is able to distinguish right from wrong. These witnesses testified that under hypnosis a person would not commit a crime unless he was already predisposed to such action.
PASSION, PREJUDICE AND ARBITRARY FACTORS
The sentence was not imposed under the influence of passion, prejudice or any other arbitrary factors.
Both defendant and his victim are white and race was not an issue at trial.
The jury instructions were correct statements of the law. As discussed more fully in Assignment of Error Number Eight, the trial court acted properly in rejecting the defendant's requested jury charge concerning one of the statutory aggravating circumstances as the proposed charge was both an incorrect statement of the law and required explanation.
The state's argument was not an impassioned plea for the death penalty nor did it *1219 reference appellate review. Argument was made that the jury should consider the death penalty as both a deterrent and a punishment. The only statement which could conceivably be construed as an emotional appeal was a reference to the victim's family and to the fact that she would never see her twenty-second birthday. This latter argument, made during rebuttal, apparently addressed a defense argument that Rault was only thirty-one at the time of the crime and was insufficient to arouse juror passion.
As discussed more fully in Assignment of Error Number Eight, the state's introduction of other crimes evidence at the sentencing hearing also failed to interject an arbitrary factor into this sentencing determination.
AGGRAVATING CIRCUMSTANCES
The jury in its verdict found the following statutory aggravating circumstances:
(a) The offender was engaged in the perpetration or attempted perpetration of aggravated rape and aggravated kidnapping at the time of the murder.
(b) The offense was committed in an especially heinous, atrocious or cruel manner.
(c) The victim was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant.
The evidence is clearly sufficient to support the jury's finding with respect to the commission of aggravated rape and aggravated kidnapping.
The evidence supports the jury's finding that the crime was committed in an especially cruel, atrocious and heinous manner. Two gunshot wounds were inflicted, one of which would have caused a slow, painful death in a matter of hours, while the other would have caused death within five to ten minutes. It is apparent that Ms. Francioni had been shot by the bullet which would have caused a slow and painful death at the time she was observed by the U.N.O. students. During a lengthy time interval, she was taken to a remote area, raped, and shot again. She was dragged around by a belt placed about her neck. Obviously, she suffered intense mental and physical pain during the ordeal. Although her throat was cut and her body set afire after she died, she had already undergone severe trauma. The factual circumstances indicate torture and the pitiless infliction of unnecessary pain. State v. Culberth, 390 So.2d 847 (La., 1980); State v. Sonnier, 402 So.2d 650 (La., 1981); State v. Sawyer, 422 So.2d 95 (La., 1982) and State v. Willie, 436 So.2d 553 (La., 1983).
This is the first jury to return a finding, as an aggravating circumstance, that the victim was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant. Defendant argues that in order for Art. 905.4(g) to withstand constitutional scrutiny,[13] the state must prove that the purpose of the killing was to prevent the victim from furnishing information to law enforcement authorities.
Here, it is unnecessary to decide whether the victim was an eyewitness to a crime allegedly committed by the defendant. Because there was proof of two aggravating factors, even if the jury erred in finding another, the error is harmless. "Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence of death based thereon." State v. Monroe, 397 So.2d 1258, 1276. Zant v. Stephens, ___ U.S. ___, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
PROPORTIONALITY OF SENTENCING
The final aspect of the sentence review requires a determination of whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. An inference of arbitrariness arises when a *1220 jury's recommendation is inconsistent with sentences imposed in similar cases in the same jurisdiction.[14]
According to statistics provided by the Orleans Parish District Attorney, there have been one hundred and six first degree murder prosecutions in the parish in which a sentence was imposed after January 1, 1976. Seventy-two of these prosecutions resulted in first degree murder verdicts. Of these seventy-two, ten defendants, including Sterling Rault, received the death penalty. No sentence has been vacated because it was found to be disproportionate. State v. James, 431 So.2d 399, 407 (La., 1983).
None of the first degree murder verdicts in Orleans Parish involved the particular factual situation present here where there was aggravated rape and kidnapping, as well as a cruel, atrocious and heinous killing. Cases from other parishes indicate that the penalty here is not disproportionate to that imposed in similar cases.
In State v. Moore, 414 So.2d 340 (La., 1982) the defendant raped the victim in her home and then stabbed her thirteen times causing a slow and painful death. A Bossier Parish jury's sentence of death was affirmed.
In State v. Willie, 436 So.2d 553 (La., 1983) defendant and his friend offered the victim a ride home from a local disco. She was taken to a remote area, raped and then held spread-eagled on the ground while her throat was repeatedly slashed by one of the perpetrators. A Washington Parish jury found two aggravating circumstances: the murder was committed during the perpetration of an aggravated rape and the crime was committed in an especially heinous, atrocious or cruel manner.
Despite the paucity of similar cases, the sentence imposed on Sterling Rault is not disproportionate to that imposed in analagous cases.
In mitigating, defendant argues that (1) the offense was committed while he was under the influence of extreme mental or emotional disturbance; (2) the offense was committed while he was under the influence or domination of another person; and (3) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect. The jury obviously accepted the opinion of the state's expert witnesses that defendant was fully capable of distinguishing right from wrong. Further, the jury rejected defendant's "Elroy did it" defense. Both decisions are supported by the evidence.
This case differs in its gruesome details from other Orleans Parish cases. Rault did not on the spur of the moment decide to kill his victim. She was forcibly carried off, her cries for help unheeded, raped and shot twice. Rault drug her around with his belt about her neck, cut her throat and then set her on fire.
Considering the crime and the defendant, the sentence is not disproportionate.

DECREE
For the foregoing reasons, the conviction and sentence of defendant, Sterling Rault, are affirmed.
AFFIRMED.
*1221 DENNIS, J., concurs with reasons.
LEMMON, J., concurs and will assign reasons.
NOTES
[1] The company is a subsidiary of Louisiana Energy and Development Corporation.
[2] "Q. Mrs. Rumage, would you tell the ladies and gentlemen of the jury what an asocial personality is?

"A. This is the type of personality who does not, or really who has never developed what we refer to in Freudian terms, a superego. They have never really accepted what is right from wrong. They are egocentric. They are the type of person who will manipulate, who finds it difficult to relate to people in a positive fashion. They are the type of person who, unfortunately, in out (sic) society often gets away
"BY MR. FULGHUM: Your Honor.
"BY THE WITNESS: Okay, I knew that was going to do it.
"BY MR. PADDISON: Is there an objection?
"BY MR. FULGHUM: Yes, sir.
"BY THE COURT: Overruled.
REDIRECT-EXAMINATION RESUMED BY MR. PADDISON:
"A. They're the type of person who can manipulate and achieve their goals through legal and illegal means. They will be very successful at doing this unless they are entrapped. Once they are entrapped, they become explosive, violent, and dangerous." (Tr. 387-388)
[3] Dr. Spiegel is a well known psychiatrist and recognized expert in the field of hypnosis. Defendant's expert psychiatrist, Dr. Steck, was his student. Dr. Spiegel wrote a textbook which discussed the phenomenon of the Grade Five Syndrome, a very deep stage of hypnotic trance.
[4] "Yes. When you asked me about this, I spoke to him yesterday just to make certain that my own information was correct about his work in regard to the highly hypnotizable, deep somnambulistic patients and he said the same thing, that it would not change your moral code." (Tr. 401)
[5] There was no objection to the charge until this appeal.
[6] R.S. 14:30 provides in pertinent part:

"First degree murder is the killing of a human being:
"(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping ... aggravated rape...."
[7] Dr. Charles Steck testified for the defense and was recognized by the court as an expert in the fields of psychiatry and hypnosis. Steck interviewed Rault on three separate occasions and hypnotized him at least twice. During the course of the direct examination of this witness, the following testimony was adduced:

"Q. Did he ever have any prior occasion, while he was under a hypnotic trance, did he ever tell you about any prior occasions where Elroy had appeared and done something to some other individual, a Ted Boleware, does that name ring a bell with you?
"A. I don't recall the name, but he did tell me that he was involved in an embezzlement in Laurel, Mississippi, and that somebody, I don't recall the name, didn't return the money and he was angry with him, the person who didn't return the money, and he told me that Elroy cut the man's brake lines. So, in my opinion, it was probably, I think that it was Sterling Rault that cut the man's brake lines." (Tr. 324)
The record is unclear as to whether this dialogue occurred during the course of an interview or during a hypnosis session. The jury had been instructed that they were not to consider as evidence the utterances made by Rault while he was under hypnosis.
[8] Jordan's criminal conduct which resulted in his conviction occurred prior to the 1979 amendment to LSA-C.Cr.P. art. 905.4(c) which now provides that the jury can consider as an aggravating factor the fact that the offender "has a significant prior history of criminal activity." The Jordan holding is premised on the conclusion that the jury can receive prior conviction evidence to ascertain the character and propensities of the offender.
[9] The requested charge provided:

"As one of the aggravating circumstances, the state has alleged that the victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness to crime alleged to have been committed by the defendant or possessed other material evidence against the defendant. "Before the jury may find the presence of this aggravating circumstance, it must consider the motive for any homicide. To find this aggravating circumstance, it is essential that the jury believe beyond a reasonable doubt that the homicide was committed to prevent material evidence or testimony from falling into the hands of the police or other law enforcement agencies."
[10] LSA-C.Cr.P. art. 905.4(h) provides:

"[T]he victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant."
[11] LSA-C.Cr.P. art. 852 provides:

"A motion for a new trial shall be in writing, shall state the grounds upon which it is based, and shall be tried contradictorily with the district attorney."
[12] Four P.S.E. tests were conducted, two while defendant was under the hypnosis. It is unclear from the record whether the proffered results are a product of a hypnotic session. Test results are as follows:

(a) The defendant told the investigator that the victim had never asked him to return any money embezzled. No stress was revealed.
(b) The defendant denied intentionally shooting the victim, but his answers revealed extreme stress.
(c) The defendant stated that he had asked his grandmother for money to help the victim, and the answer revealed no stress.
(d) The defendant said that his cousin did cut the victim's throat, but the answer revealed stress.
(e) The defendant stated that he did not wrongfully set fire to the body, and his voice revealed no stress.
(f) The defendant was asked if he had cut the brakelines on the car in Mississippi, replied that he did not, and his voice revealed no stress.
(g) The defendant was asked if he had raped the victim, and he answered that he had not, his voice betraying no stress.
(h) The defendant denied that his cousins had raped the victim, and his answers revealed no stress.
[13] "Defendant states in brief that the use of the word `alleged' in art. 905.4(h) also poses' constitutional problems."
[14] Defendant's challenge to this court's proportionality review on a district rather than state-wide basis lacks merit. On November 7, 1983, the United States Supreme Court vacated Robert Wayne Williams' stay of execution. The Fifth Circuit had granted the stay in the belief that the Supreme Court would speak on this issue when it decided Pulley v. Harris, ___ U.S. ___, 104 S.Ct. 871, 79 L.Ed.2d 29 (1983) certiorari granted to consider whether some form of comparative proportionality review is constitutionally required. The Supreme Court distinguished Williams' situation from that of the defendant granted a stay in Autry v. Estelle, 464 U.S. ___, 104 S.Ct. 24, 78 L.Ed.2d 7 (1983), noting that the "Texas Court of Criminal Appeals, like the California Supreme Court in Pulley, had wholly failed to compare [Autrey's] case with other cases to determine whether his death sentence was disproportionate to the punishment imposed on others." Maggio v. Williams, ___ U.S. ___ at ___, 104 S.Ct. 311 at 314, 78 L.Ed.2d 43 at 48 (1983). However, according to the court, that was not the situation presented in Williams: "Our prior actions are ample evidence that we do not believe that the challenge to district-wide, rather than state-wide, proportionality review is an issue warranting a grant of certiorari." Id.