HIGGINBOTHAM, J.
The defendant, Demarcus Daniel James, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. Following a trial by jury, the defendant was unanimously found guilty as charged. The trial court denied the defendant's motion for new trial and motion for postverdict judgment of acquittal. The defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant now appeals, assigning error to the sufficiency of the evidence to support the conviction.
STATEMENT OF FACTS
Around 5:00 a.m. on December 11, 2013, officers of the East Baton Rouge Parish Sheriff's Office (EBRPSO) were dispatched to an apartment complex located at 9143 Ridge Pecan Drive, after 911 calls reported gunfire. Corporal Marlon Roundtree, a crime scene investigator, and Sergeant Scott Henning, the homicide supervisor, were among the officers who responded to the scene. Corporal Roundtree took photographs and located evidence outside of the apartment, including blood trails from the apartment within the vicinity. One blood trail was coming out of the apartment door leading to the parking area, and to a vehicle that was parked at the end of the trail. Another trail of blood extended from the same apartment door/porch area, leading to a set of apartments on the other side of the same parking lot. Sergeant Henning obtained a search warrant after noting signs that a struggle took place in the victim's bedroom.[1] Subsequently, the apartment was photographed *719 and dusted for fingerprints, and evidence was collected. The officers observed additional blood that was tracked on the floor in the apartment. A bag of suspected marijuana was located on the floor near the victim's bedroom door. The body of the deceased victim, Jared Vincent, was discovered on the floor inside of his bedroom doorway.[2] Shell casings consisting of three different calibers (.45 casings, a .380 casing, and a nine-millimeter casing), and a nine-millimeter live round were located near the victim's body. Other items located on the bedroom floor near the victim's body included cash that appeared to have been pulled from the victim's right pocket, a wad of cash with an apparent bullet hole through the bills, the victim's wallet, and a cell phone. A handgun magazine consisting of twenty-eight rounds was located inside of the nightstand drawer, an empty magazine for .45 caliber rounds was located on the living room floor, and a grinder commonly used for processing marijuana with suspected marijuana residue was located on the living room table. Additional blood (on the floor, sheets, and walls), suspected marijuana, live rounds, and shell casings were located throughout the apartment, along with bullet holes in the victim's apartment and the apartment next door.
When investigators from the Coroner's Office arrived, it was noted that the victim had a visible injury on the left side of the back of his head. The victim's roommate, Leonard Wyatt, who was awakened by the gunfire, was struck by gunfire in his lower back as he jumped over the loft balcony in the apartment and fled to nearby apartments seeking assistance. As Leonard fled, wearing only the underwear and socks that he slept in, he did not see the shooting, the victim, or anyone in the apartment. He stated that he heard the victim screaming for help followed by multiple gunshots. A neighbor, Nicholas Chevalier, heard the gunshots and saw a black and tan pickup truck speed from the scene after at least two people jumped in just before the doors were closed. Nicholas relayed his observations to EBRPSO Corporal William Thomas, who was canvassing the area and located a pool of blood on the ground in the area from which the truck reportedly sped. EBRPSO Deputy James Freeman collected a sample of the blood. Though Leonard did not return after the shooting, his father assessed the apartment and Leonard reported several items missing, including game systems, a nine-millimeter firearm, and watches.
At approximately 5:50 a.m., around the time of the reported shooting at Ridge Pecan Drive, Officer Lance Bourgeois and Detective Joe Ruiz of the Gonzales Police Department (GPD) were dispatched to St. Elizabeth Hospital in Gonzales as a male (the defendant) was admitted with three gunshot wounds, a laceration on his hand, and scratches on his face. The officers briefly questioned the defendant, who was disoriented at the time, took photographs, and collected the defendant's clothing, from which money, a clear plastic bag of suspected marijuana, and a bullet fragment were recovered. The officers were informed by hospital security that the defendant had been transported there by two black males in a black pickup truck who *720 dropped him off and left. The defendant was subsequently transferred to the New Orleans University Medical Center.
While the defendant's clothes were being processed at the GPD, at approximately 8:00 a.m., the department received a call from the EBRPSO regarding another male, identified as Patrick Anderson, who was transported to Our Lady of the Lake Hospital with a gunshot wound to his hand and no other visible injuries. Detective Ruiz and Corporal Thomas proceeded to the hospital and interviewed Patrick, who was alert and coherent. Patrick was again interviewed at the Violent Crimes Unit. After the interviews, a bullet projectile, a jacket with blood on the sleeves and pocket area, and a hat with blood and debris on it, were recovered at Patrick's residence in Prairieville.
Later that day, Detective Lawrence Cavalier (EBRPSO) was dispatched to the hospital in New Orleans. He noted that the defendant seemed coherent and he advised the defendant of his Miranda[3] rights. The defendant indicated that he understood those rights and agreed to be questioned. The defendant indicated that while he was walking down Worthey Street in Gonzales, an unknown, approximately five-feet and eight-inches tall, male subject dressed in all black exited a black four-door vehicle and started shooting at him, and he was struck as he attempted to take cover. He further stated that after he was shot the vehicle left, travelling north. The defendant changed his story at trial and admitted shooting the victim and being shot as he wrestled with the victim for control of the gun. The police determined that there were no reported incidents at the location where the defendant indicated he had been shot. The next day a warrant was obtained for the defendant's arrest, he was released from the hospital and taken into custody in New Orleans as a fugitive, and Detective Cavalier returned to arrest the defendant and transport him back to Baton Rouge.
SUFFICIENCY OF THE EVIDENCE
In the sole assignment of error, the defendant argues that under the circumstances the evidence was insufficient to support the verdict. While the defendant does not deny shooting the victim, he claims that the gun was discharged in self-defense. The defendant notes that the victim was an armed drug dealer. The defendant describes himself as a mere customer, claiming he had the right to carry a firearm while attempting to purchase narcotics and an equally fundamental right to self-defense. He notes that he admitted his transgression in seeking to purchase drugs and in being armed while doing so and further notes his testimony that the victim drew his gun out of anger in response to the defendant's failure to pay a prior drug debt. The defendant argues that the State's evidence did not disprove his claim that the victim was shot in self-defense.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, i.e., "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438 ;
*721 State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660 ; State v. Wright, 98-0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157, 2000-0895 (La. 11/17/00), 773 So.2d 732. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984) ; State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932.
The crime of second degree murder, in pertinent part, "is the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625 (La. App. 1st Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Delco, 2006-0504 (La. App. 1st Cir. 9/15/06), 943 So.2d 1143, 1146, writ denied, 2006-2636 (La. 8/15/07), 961 So.2d 1160.
When the defendant in a homicide prosecution claims self-defense, the State must prove beyond a reasonable doubt that the homicide was not committed in self-defense. Louisiana Revised Statute 14:20(A)(1) provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. On appeal, the relevant inquiry is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. State v. Williams, 2001-0944 (La. App. 1st Cir. 12/28/01), 804 So.2d 932, 939, writ denied, 2002-0399 (La. 2/14/03), 836 So.2d 135. A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith. See La. R.S. 14:21.
Ivan Graham agreed to testify truthfully at the trial in exchange for a plea agreement on the charge of accessory after the fact. During the nighttime hours leading to the shooting, Ivan was travelling in a black and brown Dodge Ram that was initially being driven by his friend, Bryton Montelaro, who took LSD at around midnight. Once the LSD began to take effect, Ivan took over as the driver. After riding around, they visited Ivan's cousin, Avery Honea, and then picked up the defendant and Aaron Hargrove, who lived in the same area as Avery.
During the early morning hours, Ivan and the defendant texted the victim under the pretext of wanting to purchase marijuana, though they planned to rob him. When asked why they wanted to rob the victim, Ivan testified as follows, "I don't know. We just did. A quick come-up." He confirmed that they wanted to gain money and drugs from the robbery. Ivan and the defendant agreed to enter the apartment *722 to perform the robbery while the other two males would wait in the truck. Ivan, and he presumed the defendant, had previously purchased drugs from the victim and, therefore, believed that the victim would open the door for them while under the impression that another sale would take place. They parked in a lot near the victim's apartment. Ivan decided to stay in the vehicle with Bryton, who was "tripping" (hallucinating) from the LSD by that time, while the other three, the defendant, Avery, and Aaron, exited the truck to commit the robbery. Ivan was certain that the defendant and Aaron were armed at the time, but testified that he was uncertain as to whether or not Avery was armed.[4] Five to ten minutes later, Ivan began hearing gunshots. The defendant, who was bleeding profusely at the time, was being assisted as they ran back to the truck. Ivan attempted to figure out the location of the nearest hospital as he heard the others stating, "it went wrong," that the victim "shot back" and/or "fought back," and the defendant "got hit." Ivan admitted that he had no personal knowledge as to who fired first. They left the defendant at the hospital after helping him to the door.
Patrick Anderson lived in Prairieville at the time of the offense with his girlfriend, Deja Curtis, and sister, Keva Anderson. Deja indicated that she and Patrick were asleep on the morning in question when Patrick received a text from his cousin, Aaron Hargrove, who shortly thereafter arrived at their residence with blood on his all black clothing and shoes, and "a few" (also referenced as five or six) guns in his possession. Deja noticed that one of the guns had blood on it. According to Keva, around 6:00 a.m., Patrick woke her up and asked her to take Aaron home, who by then was wearing a white shirt and Keva's son's plaid shorts. Keva did not see any guns on Aaron's person when she gave him a ride home and was unaware that he arrived with guns that morning. After giving Aaron a ride, Keva returned home and went back to her bedroom.
According to Deja, Aaron had left one of the guns at their residence and when Patrick was attempting to clean the blood from the gun, it discharged and struck him in the hand. Keva was in her bedroom at the time and heard the gunshot. Deja accompanied Patrick as he was transported to the hospital by ambulance. While Deja and Patrick were at the hospital, Deja sent Keva a text message prompting Keva to check her car trunk. Keva opened her car trunk and observed two guns, one black and one silver and beige. She was previously unaware that the guns were in the trunk and had no idea how they got there. Keva removed the guns and hid them behind a tree at her grandmother's house before contacting her brother, Jeffery Anderson, who later retrieved the guns. Jeffery further described the black gun as possibly a nine-millimeter caliber and the silver as chrome, and possibly a .22 caliber.[5] He put the guns in his car trunk before subsequently turning them over to the police upon their request.
The fingerprint evidence was examined by EBRPSO latent print examiner Jackie Hohensee, who was qualified at trial as an expert in latent print comparison. While *723 some of the lifted prints were not detailed enough to produce conclusive results, a print taken from the 2011 Dodge Ram right rear interior door matched Bryton Montelaro's right palm print. Cheryl Swearingen, a forensic scientist of the Louisiana State Police Crime lab and a qualified firearms expert, examined the nine-millimeter and .380 handguns, and nine-millimeter, .380, and .45 caliber bullets. She concluded that the .380 casings in evidence (one was located in the gun) were fired by the .380 pistol, and five .45 caliber casings were all fired from the same weapon. The projectile recovered from the lumbar spine area of the victim was deformed and could not be matched to any weapon or casing. The nine-millimeter handgun was eliminated from connection to the casings in evidence. Tammy Rash, a crime lab DNA analyst and qualified expert, testified that the defendant's DNA was consistent with samples collected just outside of the victim's bedroom, from the victim's living room floor, and from the parking lot of the crime scene. She further concluded that a blood sample retrieved from the Dodge Ram rear passenger-seat floor was consistent with the profile obtained from the defendant. Further, the DNA sample taken from the victim's left hand was consistent with a mixture of the victim and the defendant's DNA.
The defendant testified that he had known the victim and his roommate, Leonard, for about seven to eight years prior to the shooting and had been purchasing marijuana from them for over five years. The defendant stated that he was smoking marijuana that night with Aaron when Ivan and Bryton arrived. The defendant texted Leonard because they wanted to purchase "halves." The defendant further stated that Leonard routinely instructed him not to park directly in front of his apartment, so they parked in a nearby lot. Leonard was not initially there when they arrived, so he texted him again. When Leonard texted him back, they walked over to the apartment.
After they entered the apartment, the defendant paid the victim, who began counting the money and questioning the defendant about a previous debt. A physical fight ensued after the defendant stated that he did not have the money that he owed from a previous transaction. According to the defendant, the victim stepped back and pulled out a gun. While the defendant was armed at the time with a .380 caliber handgun, he claimed that he did not initially have a chance to pull out his gun, so he grabbed the victim's gun, which discharged during a struggle. The defendant alleged he was shot as they wrestled for control over the gun. The defendant testified that he became weak, and finally let go of the gun. The victim allegedly hit the defendant in the head three times. The defendant stated that on the third hit, the gun fell out of the victim's hands, and when the victim went to pick up the gun the defendant "pulled [his own] gun out and [he] shot [the victim]."
The defendant later clarified that it was the victim who hit the defendant in the head three times with the gun before the defendant shot him. After firing his gun, the defendant fled from the apartment and Avery and Aaron helped him get back into the truck. The defendant denied that he planned to rob the victim. He stated that comments about "jacking" the victim were only meant as a joke, claiming that no one took it seriously, and that he only intended to buy marijuana. The defendant stated that he only shot the victim once, while the victim shot him three times. The defendant stated that he did not see Leonard that night.
The trier of fact is free to accept or reject, in whole or in part, the testimony of *724 any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given is not subject to appellate review. Thus, an appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. Williams, 804 So.2d at 939.
Herein, the defendant testified that he went to the victim's apartment with the intent to purchase marijuana, and that he shot the victim once in self-defense. The guilty verdict in this case indicates the jury rejected the defendant's claim of self-defense. The record indicates that the defendant and his cohorts entered the victim's apartment armed with guns. Though he claimed that it was only a joke, the defendant admitted that remarks about robbing the victim were made before they arrived at the victim's apartment, and Ivan unequivocally testified that they planned to rob the victim. The autopsy showed that the victim suffered multiple gunshot wounds. Further, the victim's roommate Leonard specifically testified, "I heard [the victim] scream, like he was screaming for me. And then I just heard, you know, like multiple gunshots." After the defendant, Avery, and Aaron returned to the truck, Ivan specifically overheard comments indicating that the victim shot or fought back. A rational fact finder, viewing the evidence in the light most favorable to the prosecution, could find that the evidence presented by the State established that the defendant was the aggressor in the conflict and, thus, not entitled to claim self-defense. Likewise, the jury could have reasonably concluded that the defendant was not defending himself when he pulled out his gun and fired it.
The defendant's testimony was self-serving and wholly inconsistent with that of Ivan and Leonard. Further, the defendant's trial testimony was inconsistent with his initial account to the police indicating that an unknown individual accosted him in the street and shot him. The defendant's omissions and actions after the shooting (of failing to report the shooting and subsequently lying to the police) are inconsistent with a theory of self-defense. See State v. Emanuel-Dunn, 2003-0550 (La. App. 1st Cir. 11/7/03), 868 So.2d 75, 80, writ denied, 2004-0339 (La. 6/25/04), 876 So.2d 829 ; State v. Wallace, 612 So.2d 183, 191 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1253 (La. 1993). We also note that "lying" has been recognized as indicative of an awareness of wrongdoing. See State v. Rault, 445 So.2d 1203, 1213 (La. 1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984). Purposeful misrepresentation reasonably raises the inference of a guilty mind. See Captville, 448 So.2d at 680 n.4. Thus, the jurors could have reasonably inferred that the failure of the defendant to tell the truth supported the inference that the truth was unfavorable to him and also showed an awareness of wrongdoing. State v. Guirlando, 491 So.2d 38, 41 (La. App. 1st Cir. 1986). The jury viewed the defendant's appearance and demeanor when he testified at trial. Their verdict indicates they found the defendant's testimony was not credible and, therefore, they gave it no weight and rejected it. This is a finding of fact over which this court has no jurisdiction. Guirlando, 491 So.2d 38 at 41.
A rational juror could have found the State established beyond a reasonable doubt that the defendant did not act in self-defense. We cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662. Accordingly, *725 we find no error in the jury's rejection of the defendant's claim of self-defense. Furthermore, an appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 2014-2295 (La. 1/27/16), --- So.3d ----, ----, 2016 WL 314814, *2-4 (per curiam). A rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could have found the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder. Due to the foregoing conclusions, the defendant's sole assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.

Prior to obtaining the search warrant, Sergeant Henning found a significant amount of blood inside the living room and followed a blood trail leading toward the back of the apartment. He observed open packages of marijuana and a handgun magazine on the floor. As the officer proceeded to the rear bedroom, it was obvious that a significant struggle had taken place inside of the room. He also saw additional quantities of marijuana in the bedroom. Based on what the officer had seen at that point, he exited the residence, and obtained a search warrant before proceeding further.

Dr. William "Beau" Clark, the Coroner for East Baton Rouge Parish (qualified at trial as an expert in emergency medicine), reviewed the autopsy report. In addition to a gunshot grazing wound on his right hand and other hand injuries, the victim suffered a gunshot to the abdomen, a through-and-through gunshot wound to his thigh, and a projectile was recovered from the lumbar vertebrae. The victim died from multiple gunshot wounds, the manner of death was homicide, and the toxicology report showed that he had marijuana and opiates in his system.

Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

Ivan's pretrial police interview, by and large consistent with his trial testimony, was played during the trial. Therein, he stated that all three individuals were armed with at least one gun each when each returned to the vehicle, conceding that they may have had other guns on their person at the time.

The guns were subsequently identified as a nine-millimeter handgun and .380 handgun. Both handguns had magazines with live bullets, and a spent casing was removed from the .380.