STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2020 KA 0243

STATE OF LOUISIANA

VERSUS

FREDERICK C. MANGRUM

JUDGMENT RENDERED: **FEB 2 2 2021**

* * * * * * *

Appealed from the
Twenty-Second Judicial District Court
In and for the Parish of Washington • State of Louisiana
Docket Number 16-CR10-133283 • Division D

The Honorable William H. Burris, Judge Presiding

* * * * * * *

David F. Gremillion
Ravi G. Shah
Covington, Louisiana

ATTORNEYS FOR APPELLANT
DEFENDANT—Frederick
Mangrum


Warren L. Montgomery
*District Attorney*
J. Bryant Clark, Jr.
Matthew Caplan
*Assistant District Attorneys*
Covington, Louisiana

ATTORNEYS FOR APPELLEE
State of Louisiana


* * * * * * *

BEFORE: WHIPPLE, C.J., WELCH, AND CHUTZ, JJ.

**WELCH, J.**

The State of Louisiana charged the defendant, Frederick Curtis Mangrum, by bill of information with sexual battery on a victim under the age of thirteen years, a violation of La. R.S. 14:43.1(C)(2). The defendant pled not guilty. After a trial by jury, the jury found the defendant guilty as charged. The trial court denied the defendant's motion for post-verdict judgment of acquittal and motion for new trial. The trial court sentenced the defendant to forty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court denied the defendant's motion to reconsider sentence. The defendant now appeals, assigning error to the admission of hearsay testimony, the sufficiency of the evidence submitted to support the jury's verdict, and the constitutionality of his sentence. For the following reasons, we affirm the defendant's conviction, but we vacate the defendant's sentence and remand for resentencing.

**FACTS**

B.J.,[1] who was eight years old at the time the defendant's trial began on July 8, 2019, testified that her father, the defendant, "digged my private part." The victim identified "tuiee" as her front private part, and again, in regard to that part of her body, stated, "He digged it." When asked what the defendant used to dig in her private part, she stated, "His hand, I think." The victim testified that she lived with her mother, but that the incident occurred during an overnight stay at a family member's home,[2] and that her mother was not present when the incident occurred. The victim testified that the next day, when she returned home, she told her mother what happened, but that her mother did nothing in response. The victim also told her grandmother. The victim did not know how many times the abuse occurred,

---

[1] According to the record, the victim's date of birth is September 7, 2010. Herein, we refer to the child victim and family members by initials only. See La. R.S. 46:1844(W).

[2] The family member was later identified as the victim's adult sister, C.M., with whom the defendant was staying at the time of the incident.

2

though she believed it only happened once. The victim was unaware of how long before the trial the incident occurred or what grade she was in at the time of the incident and could only say, "But I know I was very tiny and cute."

The victim's grandmother, A.J., testified that she learned of the incident when the victim came to stay with her in the summer of 2016. A.J. testified that the victim objected when she tried to clean the victim's private area while giving her a bath, noting the victim stated, "I want to do it myself." A.J. initially believed that the victim just wanted to be an independent "big girl." However, after the victim left for a couple of days with her mother and then returned, she exhibited the same reluctance to allow her grandmother to clean her private area during baths. A.J. stated that she began feeling "kind of bad" because she was accustomed to bathing the victim during her stayovers. She ultimately asked the victim, "Has anybody ever, you know, touched you there?" The victim did not initially reply and only looked at A.J., so she added, "Don't, just tell me the truth …I ain't going to get mad." The victim then replied, "Yes, ma'am." When A.J. asked who, the victim replied, "My daddy" and began to cry.

A.J. testified that the victim told her that she was watching television before the incident occurred. As A.J. further testified, the victim told her that the defendant took her into a room, pulled down her lower clothing, laid her back, and "had his fingers down there." A.J. attempted to console the victim, who was crying, and decided to take the victim into her physical custody without her mother's consent. A.J. called the Office of Child Protective Services ("OCS") in Bogalusa and reported B.J.'s disclosure. On August 1, 2016, A.J. brought the victim with her as she moved to Texas.

In August 2016, Captain David Miller of the Bogalusa Police Department received a referral for this case from the OCS in Bogalusa. Captain Miller learned that the victim disclosed to her grandmother that while she was in Bogalusa, in his

3

jurisdiction, she was inappropriately touched by the defendant. After learning that the victim's grandmother had also reported the victim's disclosure to child protective services in Texas, Captain Miller went outside of his jurisdiction to contact Lori Hix, a special investigator of the Department of Family and Protective Services ("DFPS") in Texas.

The victim participated in two recorded interviews in Texas, one on August 5, 2016, by Investigator Hix at the home of one of the victim's relatives, and one on August 11, 2015, by Susan Knobloch at the Children's Advocacy Center ("CAC") in Belton, Texas. On August 18, 2016, Gessica Finley, a pediatric forensic nurse coordinator at the McLane Children's Hospital in Temple, Texas, conducted a medical evaluation and an unrecorded interview of the victim. During the three interviews, the victim identified her father, the defendant, as "Bullet." The victim did not disclose any abuse or inappropriate behavior during the interview with Investigator Hix. However, during the CAC interview, the victim described an incident in which her father digitally penetrated her "tuiee" and her "butt." As indicated in Nurse Finley's notes, the victim made a similar claim during the interview at the McLane Children's Hospital.

The defendant testified at trial and confirmed that in 2014 (while he and the victim's mother, D.J., were still together) there was a time period during which he and the victim spent one or two nights at the home of C.M., the victim's adult sister. However, the defendant repeatedly denied ever sexually abusing or touching the victim inappropriately.

## SUFFICIENCY OF THE EVIDENCE

In his second assignment of error, the defendant argues that the State failed to present sufficient evidence to support the jury's verdict. The defendant concedes that the victim was under the age of thirteen at the time of the alleged incident, but argues the State failed to prove beyond a reasonable doubt that he

4

touched the victim in an inappropriate manner. He contends that although the victim testified, she did not remember details or the statements she gave to interviewers, including Ms. Knobloch and Nurse Finley. The defendant notes that there was no physical evidence to prove any form of sexual battery. He further notes that Investigator Hix testified that the victim did not say in her initial interview that the defendant touched her private parts and that the victim's mother denied the victim ever told her the defendant touched her private parts. The defendant contends the victim gave conflicting accounts as to what happened after she told her mother about the allegations. Specifically, the defendant contends the victim testified that her mother did nothing about the allegations, but told interviewers that her mother stabbed the defendant when she found out. The defendant argues that due to the victim's admitted untruths and her grandmother's ability to influence her, the victim's credibility is questionable. Reiterating that the victim made inconsistent statements and the lack of physical evidence in this case, the defendant argues that hearsay testimony was the only evidence that could have convinced the jury beyond a reasonable doubt.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The sufficiency claim is reviewed first because the accused may be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 101 S. Ct. 970, 67 L. Ed. 2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with **Jackson v. Virginia**, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. **State v. Hearold**, 603 So. 2d 731, 734 (La. 1992). See also La. C.Cr.P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So. 2d 654, 660. When the entirety of the evidence, including inadmissible

evidence that was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta, since those issues are moot. **Hearold**, 603 So. 2d at 734.

On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, the accused must receive a new trial but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. **Hearold**, 603 So. 2d at 734; **State v. Major**, 2019-0621 (La. App. 1st Cir. 11/15/19), 290 So. 3d 1205, 1209, writ denied, 2020-00286 (La. 7/31/20), 300 So. 3d 398.

The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Legaux**, 2019-0075 (La. App. 1st Cir. 9/27/19), 288 So. 3d 791, 794. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder, in order to convict, must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. James**, 2017-1253 (La. App. 1st Cir. 2/27/18), 243 So. 3d 717, 721, writ denied, 2018-0419 (La. 1/8/19), 259 So. 3d 1024.

Louisiana Revised Statutes 14:43.1(A) provides, in pertinent part:

A. Sexual battery is the intentional touching of the anus

or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, *directly or through clothing*...when any of the following occur:

\*\*\*

(2) The *victim* has not yet attained fifteen years of age and is at least three years younger than the offender.[3]

(Emphasis added).

Sexual battery is a general intent crime.[4] **State v. Stevenson**, 2005-52 (La. App. 5th Cir. 6/28/05), 908 So. 2d 48, 53, writ denied, 2005–2592 (La. 6/2/06), 929 So. 2d 1247. It is well settled that, if found to be credible, the testimony of the victim of a sex offense alone is sufficient to establish the elements of the offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. **State v. Lilly**, 2012-0008 (La. App. 1st Cir. 9/21/12), 111 So. 3d 45, 62, writ denied, 2012-2277 (La. 5/31/13), 118 So. 3d 386.

Likewise, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. **State v. Higgins**, 2003-1980, (La. 4/1/05), 898 So. 2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S. Ct. 182, 163 L. Ed. 2d 187 (2005). Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the

---

[3] Prior to the amendment of the sexual battery statute by 2015 La. Acts, No. 256, § 1 (eff. Aug. 1, 2015), La. R.S. 14:43.1 previously provided, as follows:

> Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender...when any of the following occur:
>
> (1)    The offender acts without the consent of the victim.
>
> (2) The act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender.

[4] General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2).

credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **Lilly**, 111 So. 3d at 61.

Dr. Anne Troy, a trained forensic interviewer and pediatric nurse practitioner at the Children's Hospital in the Audrey Hepburn Care Center, a clinic for evaluating kids for allegations of physical or sexual abuse, testified at trial as an expert in the field of child abuse maltreatment and sexual abuse. Dr. Troy testified that as a "SANE," a sexual assault nurse examiner, her primary role is to collect evidence in acute cases. She testified as to several factors that can affect the timing and method of disclosure by a victim, such as the level of trust developed by a perpetrator during a period of grooming, the likelihood that the perpetrator is a family member and/or someone the victim loves, and the victim's level of resilience, naivety, and/or anxiety. In elaborating on the factor of naivety, Dr. Troy stated, "They just think everybody's Paw-Paw touches them like that. And they don't realize until they are [in] school that that was not a touch that was appropriate." Dr. Troy noted that some victims feel guilty or ashamed and/or have been threatened by the perpetrator. Further, Dr. Troy noted the possible factor of an ongoing threat of abuse that could cause a victim to be fearful and less likely to talk about the abuse. Dr. Troy also indicated that the victim's age can play a role in their developmental ability to provide history and make detailed sensory statements.[5]

Dr. Troy further explained the gradual nature or process of disclosure, the possibility that a child may "disassociate" while being questioned, and the possibility of the victim having a "blending of memories if there's been multiple

---

[5] Dr. Troy did not define the term "sensory statements," but elaborated as follows: "We want to ascertain what room they were in. What they were seeing. Tell me something about their clothing."

months or years of abuse." She noted that the initial disclosure may only be "the tip of the iceberg" or could even be accidental, citing for example cases in which a child initially perceives and describes an incident as being tickled, but then reveals inappropriate behavior as a result of further generalized questioning. Dr. Troy also testified regarding the commonality of a lack of physical evidence of abuse. She noted that the vaginal area, consisting of tissue similar to the tissue inside of the mouth, starts to heal within hours of penetration. Dr. Troy stated that if a child is not examined within twenty-four hours of the act, her body would have healed and there will be no physical fissures, bruising, or swelling. Dr. Troy described interview techniques such as building a rapport with a child and helping them identify parts of the body through the use of diagrams. She noted that it would be difficult to "coach" a child in preparation for questioning by a trained interviewer, as the average person would be unable to anticipate the questions that will be asked. Dr. Troy confirmed that trained forensic interviewers use open-ended, non-leading questions.

Dr. Troy was asked if, during the course of her practice, she encountered a child who described a fantastical or made-up reaction by his or her loved one after the child made a disclosure. She replied, "Developmentally, when we talk about trying to overcome something that is happening, I actually had kids who have been raped will say, 'Then I turned in to [sic] Batman, and I pulled out my laser, and I shot them." Dr. Troy explained that in that situation, the child is relaying an ending that gives them some power and saying what they had hoped would happen.

At trial, the victim testified and demonstrated that she knew the difference between the truth and a lie and agreed to provide truthful testimony. While she initially stated that the defendant used his hand when he "digged" her private part, as previously noted, she added, "I think" and then admitted that she did not

actually know what the defendant used. When asked how it made her feel when her mother did not do anything after the disclosure, she stated, "Sad." By contrast, she noted the following as her grandmother's reaction: "She wanted to make sure that I'm okay. And she took very good care of me." The victim was questioned in graphic terms as to whether she was telling the truth or a lie when she told her mother and grandmother what happened and responded, "The truth." She did not recall telling anyone that her mother had a fight with her father after she told her mother about the incident. The victim confirmed that if someone stated that she saw her mother stab her father with a knife, that would not be the truth. She further confirmed that her trial testimony was truthful.

The victim recalled staying with her grandmother during the summer of 2016, when she was five years old. She further confirmed that her grandmother would sometimes help her bathe and recalled, at one point, telling her grandmother that she did not want her to give her a bath. When the victim was asked if anyone told her what to say at trial, she responded positively. When then asked what she was told, she testified, "My Granny told me that it doesn't matter what they say, as long as I tell the truth. Jesus will be right there beside me to make sure that I do good." When asked if her grandmother ever asked her to tell something or say something that was not true or did not happen, she responded, "No."

On cross-examination, the victim was again asked if she knew how many times the act occurred, and was then asked if she knew whether it happened at all. She responded negatively to both questions. The following colloquy then took place:

> Q. It didn't happen at all? You don't know whether it happened at all?
> A. I think it happened. I don't remember when.
> Q. You don't remember when. Right. But you, do you remember -- I think what you said, you remember you being at a relative's house?
> A. (Witness nods head affirmatively).

10

Q. A family member's house?
A. Yes.
Q. Who else was there?
A. I think it was my two cousins and their mom.
Q. Their mom is named what?
A. I forgot it.
Q. [C.M.]?
A. Yes.

After being asked a series of detailed questions, the victim was later asked, "And you think that your dad dug in your private parts, too, correct? But you don't know for sure?" She replied, "I know he did it." When asked why she previously stated that she *thinks* he did it, she replied, "No. I know he did it. But I don't know how many times he did it."

When repeatedly asked if it would be the truth or a lie if she told someone that her mother was there when the incident occurred or that her mother cut or stabbed her father with a knife, she consistently stated that such claims would be "a lie." The victim also indicated that she could not recall any pretrial interviews. She confirmed that if she ever previously denied that the incident occurred, that would have been, "A lie." When specifically asked if she recalled telling Ms. Knobloch during an interview that her grandmother told her everything to say, she stated, "I don't remember." As a follow-up question, she was asked, "If you did tell her that, would that be the truth or would that be a lie?" In response, the victim replied, "A truth, I think." On redirect, the victim confirmed that she was confused by some of the questions asked during cross-examination. She reiterated that everything she said at trial was the truth.

On August 5, 2016, Investigator Hix interviewed the victim—who was five years old at the time—at her great uncle's residence. Investigator Hix testified that she was hired by the DFPS because they needed someone to help with the transition of cases between case workers and law enforcement. She noted that the case workers were on a timeline due to their efforts to put the safety of the child

11

first and foremost, whereas law enforcement officers were concerned with maintaining the integrity of evidence. Investigator Hix confirmed that during her interview, the victim did not disclose that she had been sexually assaulted. She further confirmed that she did not interview the victim in a controlled or secluded environment. In describing her interviews, Investigator Hix stated, "they scratch the surface of things." She further testified that when asking "basic questions" to assess the safety of the child, she does not "go in to [*sic*] any detail."

During the audio recorded interview, which was played at trial, Investigator Hix initially asked the victim general questions like whether she would ever get into trouble or was ever put in time out, and whether she had plenty of food to eat and plenty of clothes. Investigator Hix further asked the victim if she understood the term "private parts." In response, the victim named parts of the body including "the arm, your knees, your feet, your ankle, and your elbow, and your back." Investigator Hix attempted to explain to the victim where her private parts were located, stating that they were the parts of the body that were covered by swimsuits. However, the victim stated, "swimsuits cover up everything so no kids can see." When asked if anyone has ever seen or touched her private parts, the victim responded negatively and began indicating that she wanted to show Investigator Hix her bathing suit.[6] When questioned again about private parts, she stated, "the private parts like in your whole body...like where you broke your bones in your private parts, you have to go to the doctor...your elbow will break in your body." Towards the end of the interview, Investigator Hix asked the victim if anyone ever hurt her at her grandmother's house or at her mother's house; the victim responded negatively as to each residence. After the victim twice asked about ending the interview, Investigator Hix ultimately stopped the interview.

---

[6] At trial, Investigator Hix confirmed that the victim did in fact show her the bathing suit, which was a one-piece, children's swimsuit. Family members could occasionally be heard talking in the background during the interview.

As Investigator Hix noted at trial, the victim did not seem to grasp the concept of "private parts" during the twenty-minute interview. Investigator Hix further noted that the lack of any information from the victim indicating that she had been abused conflicted with the information that Investigator Hix received from OCS in Bogalusa. Thus, Investigator Hix scheduled an interview at the CAC, which Investigator Hix described as a "child friendly environment" that "puts the child more at ease." Investigator Hix further testified, "These people do not talk to children. That's their job. For me, my job is to assess this child's safety and ensure that she is in a safe place at this time." Investigator Hix noted that she was not trained in interviewing young children.

Ms. Knobloch, a forensic interviewer at the CAC in Belton, Texas, at the time, interviewed the victim on August 11, 2016. At trial, Ms. Knobloch described the CAC as a non-profit, child-friendly, neutral setting with a secluded interview room and a separate observation room. She defined a forensic interviewer as a person who gathers information in a neutral manner, using non-leading questions. Near the outset of her interview, Ms. Knobloch asked the victim if she wanted to talk about anything, and the victim stated, "talk private parts." At that point, Ms. Knobloch explained to the victim that she could talk to her about anything and later explained the importance of telling the truth. The victim stated that her grandmother and uncle brought her to the interview that day. The victim also stated, "My granny said if I did good over here, she gonna set everything up for my birthday party." When asked if "Granny" told her what to say, the victim stated, "I know what to say…'cause Granny told me everything." She later added that her grandmother told her to talk "about the private parts my daddy be doing to me." When asked how her grandmother knew, the victim stated, " 'Cause I told her all about it[,] and I told my mama too."

Ms. Knobloch asked the victim to tell her what she told her grandmother,

and that her grandmother wanted her to tell what happened. The victim stated that she was going to tell her the truth. The victim stated, "One day I was by my friends' house...my daddy came in the room, grabbed my hand, take me in the room, push my head down, take all my clothes off, then this hand [holding one finger up], stick it all the way down my tuiee."[7] Seemingly referring to the same day or night, the victim stated, "Then I was in the living room again, he grabbed me, tear my clothes off, turned me around, dig in my butt." When asked what he put in her butt, she stated, "he put his hand [again held one finger up] in my butt then he smelled it." She stated that her father shut the door hard when he entered the room, adding that it was her father's room. She pointed to her vaginal area when asked what a "tuiee" was and pointed to her backside to identify her "butt." When asked what her father was wearing, the victim stated he was wearing "some drawers."

The victim stated that after the incident, her mother and father messed up the whole house because her mother did not want her father to touch her. She added that her mother had a knife, that she cut her father's chest, and that he died. When asked if that was the truth, without pause she stated, "That's not the truth." When asked if it was the truth that her father touched her tuiee, she shook her head up and down, indicating a positive response. The victim stated that her father later said, "'I'm sorry what I did to you,'" and she told him, "It's okay." She further stated that her father asked, "Will you be um my baby again?" When asked how many different days it happened, one day or more than one day, she stated that it happened "one day." When asked how it felt, she stated that it felt like his hand, and when asked if it hurt, she said, "Some things...his hand." When asked if anyone else ever touched her tuiee or her butt, she stated, "My daddy." When asked if it was inside or outside when her father touched her butt, she said "inside."

---

[7] The victim named her two nephews, C.M.'s children, after calling them "friends."

When asked what he did after that, she again said "he smelled it."

Nurse Finley also testified at trial. At the time of the trial, Nurse Finley had seen over eleven hundred cases of abuse in her roughly five years of forensic nursing. Regarding medical evaluations of sexually assaulted children, she stated that DNA or trauma are not likely to be found because most of the cases involve delayed outcries. On August 18, 2016, Nurse Finley interviewed and medically examined the victim at the CAC and prepared a report. She noted that the victim was alert and oriented at the time, but initially shy and inquisitive. Nurse Finley explained that she was trained to ask open-ended questions, while ascertaining the history of the child and further noted that she took word-for-word notes of the victim's responses during the interview. Nurse Finley noted that she showed the victim body diagrams to help her identify body parts.

Nurse Finley confirmed that the victim detailed being the victim of sexual assault or abuse. Specifically, according to Nurse Finley's notes, Nurse Finley asked the victim, "Has anything ever happened to your body that you didn't like or that hurt?" The victim replied, "Umm...I didn't like because how my Daddy did to me wrong." Finley further asked the victim, "Where did this happen?" The victim replied, "He [was] with my sister [C.M.]." Nurse Finley then asked the victim, "Tell me what did your Daddy do to your body that you didn't like?" As to the victim's response, the notes further state, "He touched me by my private parts [indicates female sexual organ on body diagram, 'tooey']." As Nurse Finley further stated in her notes and referenced at trial, the victim added, "And when he got done he told me, he said sorry. I told him it's ok so he just sat in the bed."

Nurse Finley noted that the victim initially stated that the defendant touched her on her skin, afterwards said that it was not on her skin, but then confirmed that he touched her underneath her panties. The victim denied that anything else happened. When asked if this had happened before, the victim stated, "Like the

other day I was by my Daddy that's how he told me about stuff." She added, "That's all he did to me."

Nurse Finley testified that towards the end of the history portion of the interview, the victim asked her a specific question and seemed to answer her own question. Specifically, as indicated in the notes, the victim asked, "Do dad's [sic] ever touch you here [points to genitals] by their wiener with boys instead of girls[?]" and "Why do they do that? Do you know why? Because dad's [sic] do bad. These private parts really bad." Nurse Finley testified that she did not have any concerns that the victim in this case had been coached prior to the interview. Nurse Finley confirmed that she did not find any physical evidence of an injury.

A.J., the victim's grandmother, testified that she had been taking care of the victim since May 25, 2016. A.J. testified that before the victim told her what happened to her, she had no ill feelings toward the defendant. She noted that outside of the incident at issue in this case, to her knowledge, the victim never experienced any other abuse. A.J. noted that the victim's mother had eleven children, but did not have custody of any of them. A.J. had custody of four of the children, including the victim. A.J. confirmed that she had called OCS in the past, prior to the victim's disclosure, because she wanted to "get [B.J.]" and force the victim's mother to "get herself together." A.J. noted that the victim's mother would often move and would take the victim "from here to there."

A.J. was asked how she would respond to someone who accused her of telling the victim what to say in order to take custody of the victim. She, in part, replied, "You know what? This is what I'm going to say…A person have to have a warped up mind to sit there, to put something in a child's mind to say that about another human being. Don't you know what that would do to a child?" A.J. specifically denied coaching the victim in any way or offering her any reward. A.J. further denied that the victim told her that her mother and father had a fight

after the victim told her mother about the incident. A.J. explained that the victim only stated that her parents argued. A.J. further noted that someone else told her that the victim's parents had a fight, causing her to assume that the victim forgot to tell her about the fight or was outside playing at the time. A.J. admitted that she may have been confused as to who provided her with details of the altercation between the victim's parents. On cross-examination, A.J. testified that she only told B.J. to tell the truth and that, "Jesus is going to be right there with you." On redirect, A.J. confirmed that she would answer questions if the victim asked about such things as private parts, but she never told the victim what to say.

The victim's mother, D.J., also testified at trial. Among D.J.'s eleven children, she had four of them before her relationship with the defendant began, and the defendant fathered six of them, including the victim. D.J. only had custody of one of her children at the time of the trial. She noted that four of her children moved to Texas at different times and when asked why, she testified, "Because I was drugging." She clarified that "drugging" meant she was selling drugs and snorting cocaine. D.J. further testified, "My mom [A.J.], she called the people and told the people that the man that was doing our yard was raping my girls." When asked which girls, she named three of her daughters, not including the victim in this case. D.J. stated that the case was thrown out after the man took a lie detector test. She added, "I don't know what all happened after that. But I know he didn't go to jail." D.J. stated that the three named daughters began living with her aunt. She stated that A.J. was supposed to have six of her children but instead kept the boys while her aunt kept the girls.

D.J. further testified that she stopped doing drugs when the victim was born, but A.J. kept the victim for approximately six months, when she was an infant, while D.J. was attempting to prove to OCS that she was drug-free and serious about her situation. She stated that A.J. returned her children to her in 2010. D.J.

17

confirmed that the victim was moved "back and forth" between her and A.J. during the first year of her life, and then between her and the defendant as she got older. D.J. noted that she raised her sons herself from 2010 to 2015. According to D.J., in January 2015, A.J. needed money to avoid being kicked out of her house. D.J. further noted that A.J. was getting money and food stamps for her children even when they were not living with A.J. D.J. testified that she returned the boys back to A.J. in January 2015, but she kept the victim and was still in a relationship with the defendant at that time.

D.J. testified that she and the defendant ended their relationship when the victim was five years old. When asked if the defendant was still around the victim after they ended their relationship, she confirmed that they were together during Mardi Gras in 2016 and noted that the victim's sister, C.M., and C.M.'s two sons would sometimes pick up the victim. D.J. testified that she was always present when the victim and the defendant were at C.M.'s house. When confronted with the victim's testimony that her father "touched her on her tuiee[,]" D.J. stated, "Never." She added, "It never happened. We wouldn't even be having this trial. I be [sic] on trial." When asked for what, she stated, "Killing him." D.J. testified that she would often stress to the victim that if someone ever touched her to let her know, adding, "Because my own daddy did it to me." She further testified, "And I told my mom, and she didn't do nothing about it. Told me I better never tell nobody." D.J. consistently denied that the victim ever told her that she was sexually molested by the defendant.

D.J. also denied having an altercation with the defendant over the victim's allegations. She stated that A.J., however, knew about a previous argument that she had with the defendant before the victim was born, and at that time, she told her mother, "Yeah. I ought to go stab him." D.J. speculated that her mother coached the victim to tell the lie about a knife. D.J. further stated that the victim

18

was afraid of A.J.

C.M., the victim's adult sister, who was thirty-four years old at the time of the trial, testified that she lived in Bogalusa between 2015 and 2016, with her two children and her sister (not the victim). C.M. testified that in 2015 and 2016, the defendant (her father) was living with her grandmother, adding, "in and out." C.M. stated that the defendant would come to her house, "Every blue moon." C.M. further indicated that the defendant would stay at her house sometimes when he came to Bogalusa, but not often.

C.M. recalled an occasion, during that time, of the defendant being at her house while the victim was there. C.M. stated that her two children and her sister who lived with her were also there at the time. When asked if the defendant had his own bedroom at her house, she confirmed that he had a room that he stayed in and that "[a]round the time he was coming" he would spend the night there. C.M. stated that the victim was not often there at the same time as the defendant. When asked if she ever knew of the defendant taking the victim into his room, she stated, "No. Every time she stayed with us, she sleep with me and my boys."

C.M. recalled the victim being at her house during Mardi Gras of 2016, but stated that the defendant was not there at that time and that the victim did not spend the night at that time. C.M. specifically denied that the defendant could have sexually molested the victim at her house, noting that the victim was always with her and her two sons.

In addition to confirming that he and the victim stayed at C.M.'s house overnight at the same time on at least one occasion, the defendant confirmed that he would still occasionally stay at C.M.'s house after he and D.J. ended their relationship. When asked why the allegations against him were made, the defendant testified that A.J. may have initiated the allegations for financial gain, noting that when he met D.J., A.J. did not have money for rent. The defendant also

19

asserted that A.J. "kept sending OCS people out" in an effort to get custody of the victim. When asked if he was tested for drug use by OCS, he confirmed that he was drug screened, that he tested positive for marijuana, and stated, "they found marijuana and stuff." In repeatedly denying ever abusing the victim, he testified, in part, "That's not true. I would never, never. You put a gun to my head and ask me to touch a child, you get ready to blow my brains out. Because I would not do it, or deny my God. I die for them two things." The defendant was sixty-one years old at the time of the trial.[8]

An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v. Hano**, 2005-2090 (La. App. 1st Cir. 6/9/06), 938 So. 2d 181, 187, writ denied, 2006-1713 (La. 1/26/07), 948 So. 2d 164.

Herein, the jury heard the testimony of all the witnesses, including the victim's trial testimony, the defendant's adamant denials during his trial testimony, and the victim's pretrial recordings. While the victim did not make a disclosure during the initial interview that took place at the home of a family member, her subsequent interview was wholly consistent with the testimony that she presented at trial. Although the victim's mother testified that she was always with the defendant and the victim when they were at C.M.'s residence, C.M. and the defendant specifically recalled at least one occasion wherein the victim spent the night at C.M.'s house while the defendant was staying there. While the victim was unable to relay details such as dates, the victim made seemingly independent,

---

[8] The defendant confirmed that approximately thirty years before trial, he had previously been

consistent, and detailed statements regarding the defendant's acts of abuse.

In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See Ordodi, 946 So. 2d at 662. Based on the record before us, the jury could have concluded that the defendant used his hand or finger to intentionally touch the anus or genitals of the victim. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Calloway, 2007-2306 (La. 1/21/09), 1 So. 3d 417, 418 (*per curiam*). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 2014-2295 (La. 1/27/16), 269 So. 3d 698, 703 (*per curiam*). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of sexual battery. Thus, we find that assignment of error number two lacks merit.

### HEARSAY TESTIMONY

In his first assignment of error, the defendant argues that the trial court abused its discretion and misapplied the law in admitting hearsay testimony of Nurse Finley, regarding allegations by the victim. Noting the trial court conceded there was a forensic component to Nurse Finley's interview of the victim, the defendant contends that the trial court erred in concluding that the main reason for the interview was medical. The defendant notes that Nurse Finley admitted that

---

convicted of possession of cocaine, "Probably twice, I think."

the interview had a forensic purpose and that the CAC only accepts referrals from CPS and law enforcement. The defendant further notes that the interview did not take place at a hospital, but instead took place at the CAC, where he claims interviews are performed solely for law enforcement and CPS. The defendant contends that Investigator Hix, a CPS investigator, referred the victim to the CAC and ultimately Nurse Finley. He contends that such referrals only occur due to an alleged crime or mistreatment. The defendant concludes that Nurse Finley's testimony should have been excluded based on holdings in **State v. Brand**, 2016-0960 (La. App. 1st Cir. 12/22/16), 2016 WL 7407414 (unpublished), writs denied, 2017-0167, 2017-0131 (La. 9/15/17), 225 So. 3d 478, 479, and **State v. Greene**, 2006-0667 (La. App. 5th Cir. 1/30/07), 951 So. 2d 1226, 1234, writ denied, 2007-0546 (La. 10/26/07), 966 So. 2d 571. The defendant further claims that Nurse Finley's testimony was "powerful" and notes that the State relied on it during its closing argument. Contending again that the victim made inconsistent statements and that there was no physical evidence in this case, the defendant argues that the admission of the hearsay testimony caused irreparable harm and affected the outcome of the trial.

Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. Under La. C.E. art. 803(4), hearsay concerning medical treatment and diagnoses is admissible; if the principal reason for the medical examination, however, is forensic, then such hearsay is inadmissible. **Brand**, 2016 WL 7407414 at *2. A trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent a clear abuse of the trial court's discretion. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is

substantially outweighed by its prejudicial effect. **Brand**, 2016 WL 7407414 at *4.

Louisiana Code of Evidence article 803(4) specifically provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> **(4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment.** Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.

In this case, at the hearing that occurred outside of the presence of the jury, Nurse Finley testified that she had been a forensic nurse since 2014, specifically defining "forensic" as a combination that occurs when medical and legal systems intersect. She testified that as a forensic nurse, her goal is to make sure that her patients get all of the medical care that they need based on their conveyed story about their body. She confirmed that there is a forensic component to her examinations, stating that depending on the type of case, if evidence is not collected from the patient's body by use of DNA swabs, then the history is the evidence. She also noted that evidence may consist of photo documentation and/or testing for sexually transmitted infections. Nurse Finley added, "So essentially everything that I do is for medical diagnosis and treatment with that component of potential evidence." She confirmed that the forensic component never supersedes the medical intentions of an evaluation.

Nurse Finley stated that the primary goal of the examination was medical and the exam included four steps: (1) acquiring a history (the most important part which guides the rest of the exam); (2) conducting a detailed head-to-toe exam; (3)

23

conducting an anogenital exam (using a camera to observe the genitals in depth to highlight any faint trauma, injury, or infection); and (4) collecting and documenting by photo all evidence obtained in the prior three steps (the evidentiary component). She also noted that she tests for sexually transmitted diseases to make sure that the patient gets appropriate treatment and coordinates provider or social worker referrals when necessary.

Nurse Finley was housed at the CAC when she conducted the forensic medical examination of the victim in this case. She noted that the forensic examiners had their own room at the CAC and that they partnered with the CAC to avoid having patients go to more than one location. She noted, however, that she was not equipped to do blood work at the CAC, which she noted was outside of her realm. During cross-examination, Finley explained that a "SANE," a sexual assault nurse examiner, is a subset sub-specialization of a forensic nurse. She noted that forensic nursing was slightly broader and covers a multitude of different types of exams such as neglect, physical abuse, strangulation, and domestic violence. Nurse Finley had training to perform each of the named exams.

Nurse Finley noted that in this case, only she and CPS were involved at the time of the exam. While she confirmed that the police and CPS were the only agencies who could refer children to the CAC, she confirmed that CPS referred the instant case and that she was consulted out of an abundance of caution. She stated that her purpose is to provide medical treatment, after determining if it is necessary, when there is a concern. She stated that in this case, she gave her report to CPS. The exam in this case was classified as nonacute, as there was no indication that an incident occurred within 96 hours of the exam and no known date of any incident. Thus, the exam was considered to be outside of the window for potentially collecting evidence from a patient's body. In denying the defendant's motion *in limine,* the trial court stated in part, "It's very clear to me

24

that, although there's a forensic component to this, it's been made plain…that the primary purpose of this is, indeed, medical diagnosis and treatment."

In **Greene**, 951 So. 2d at 1234, the defendant was charged with the aggravated rape of his twelve-year-old daughter. The defendant challenged the testimony of Dr. Sonseeahray Bridges and Dr. Ellie Wetsman. Before Dr. Bridges took the stand, the defendant objected to her and Dr. Wetsman's anticipated testimony about what the victim told them during the medical exam. The trial court sustained the objection. The State took writs, arguing the testimony fell within the hearsay exception under La. C.E. art. 803(4). A fifth circuit panel granted the writ and, accordingly, Dr. Bridges and Dr. Wetsman were both allowed to testify regarding the history given by the alleged victim at the time of the examination. In light of the subsequent trial court record, the **Greene** court determined that its writ grant was patently erroneous and produced unjust results. The fifth circuit explained that at the time it decided the writ, Dr. Bridges and Dr. Wetsman had not testified, but that on appeal, it had the testimony at issue available for review.

The **Greene** court, 951 So. 2d at 1234-35, found that it was questionable whether the testimony of either doctor regarding what the victim told them by way of a history was admissible under La. C.E. art. 803(4). Dr. Bridges examined the victim after she was referred by Deputy Cannizaro, close to two months after the last incident of alleged abuse; she ordered routine lab work dictated by the allegation of sexual abuse. As such, the court felt the principal purpose of Dr. Bridges' examination of the victim was forensic.

Similarly, in **Brand**, 2016 WL 7407414, the victim was examined and treated at Children's Hospital emergency room on November 4, 2013. Over two weeks later, the victim was seen by Dr. Wetsman at Children's Hospital Audrey Hepburn Care Center. This court noted the record indicated that Dr. Wetsman saw

the victim only one time and that law enforcement had referred the victim to the doctor. The Audrey Hepburn Care Center billed St. Tammany Parish Sheriff's Office $300 for the victim's visit/treatment there. The following day, Dr. Wetsman faxed her report on her treatment of the victim to a detective. While some of his testimony arguably suggested that the purpose of Dr. Wetsman's exam of the victim was for diagnosis and treatment, this court found that such purpose was apparently subsidiary and that the main purpose of the examination, as the defendant therein argued, was forensic.

In this case, Nurse Finley adamantly testified that the main purpose of her interview of the victim was for medical evaluation and treatment. She further noted that she was not directly referred to the victim by the police and that her agency was non-profit. In any case, even assuming that her purpose was mainly forensic, inadmissible hearsay that is merely cumulative or corroborative of other testimony adduced at trial is considered harmless. **Brand**, 2016 WL 7407414 at *7 (citing **State v. Spell**, 399 So. 2d 551, 556 (La. 1981)). In this case, the victim's statements to Nurse Finley were generally consistent with her allegations during the CAC interview by Ms. Knobloch, the victim's trial testimony, and the testimony of A.J., the victim's grandmother. Thus, the cumulative nature of the testimony presented by Nurse Finley, rendered any error, assuming such occurred, harmless in this case. See **Brand**, 2016 WL 7407414 at *7. Thus, we find no merit in assignment of error number one.

## PATENT SENTENCING ERROR

In his third assignment of error, the defendant argues that based on "the totality of the circumstances" the sentence imposed in this case, though admittedly within the statutory range, is excessive and is a cruel violation of his constitutional rights. However, as noted below, this court's routine patent error review revealed a sentencing error that requires this court to vacate the imposed sentence.

26

Pursuant to La. C.Cr.P. art. 920(2), in conducting a routine patent error review, this court shall consider "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." In reviewing the instant record for patent error, we discovered that after the denial of the defendant's motion for new trial, the trial court did not wait the required twenty-four hours before imposing sentence, nor did the defendant waive that waiting period. See La. C.Cr.P. art. 873.

Louisiana Code of Criminal Procedure article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

In **State v. Augustine**, 555 So. 2d 1331, 1333-34 (La. 1990), the Supreme Court held that a trial court's failure to observe the twenty-four hour delay is not harmless error if the defendant challenges the sentence on appeal. Therefore, given the circumstances presented herein, we must vacate the defendant's sentence and remand the case to the trial court for resentencing. See **Augustine**, 555 So. 2d at 1334-35; **State v. Denham**, 2001-0400 (La. App. 1st Cir. 12/28/01), 804 So. 2d 929, 932, writ denied, 2002-0393 (La. 1/24/03), 836 So. 2d 37; **State v. Claxton**, 603 So. 2d 247, 250 (La. App. 1st Cir. 1992). As such, we pretermit consideration of the defendant's third assignment of error, which raises the issue of excessive sentence.

## DECREE

For the foregoing reasons, we affirm the defendant's conviction. We vacate the defendant's sentence and remand the matter for resentencing

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED.**